NOT DESIGNATED FOR PUBLICATION

Nos. 127,604
127,605

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.L.S. and S.E.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Butler District Court; JOE E. LEE, magistrate judge. Submitted without oral argument. Opinion filed April 25, 2025. Affirmed.

*Thomas C. McDowell*, of CornerStone Law, LLC, of Newton, for appellant natural mother.

*Devin H.S. Canfield*, assistant county attorney, for appellee.

Before ATCHESON, P.J., COBLE and PICKERING, JJ.

PER CURIAM: The district court terminated Mother's parental rights to S.L.S. (born in 2011) and S.E.S. (born in 2012), citing eight statutory factors for determining unfitness. Mother appeals, arguing that there was not clear and convincing evidence that she was unfit or that her conduct was unlikely to change in the foreseeable future. Mother also claims that termination was not in the children's best interests. After reviewing the record, we find Mother's arguments unpersuasive and affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2022, El Dorado Police Officer Brendan Crawley stopped Mother's vehicle after Mother left an address known to police for suspected drug activity. Mother told Crawley she had dropped off Dennis Pickett, whom police knew to be involved in drug

1

activity. Another officer deployed his K-9 on Mother's vehicle, after which police found a box containing drug paraphernalia and suspected fentanyl pills. Mother "admitted to purchasing [f]entanyl pills once a week and buys five to ten pills at a time for $10 a pill." Mother stated she contacted Pickett and another individual over the phone when she wanted to buy fentanyl.

The following month, Crawley and other officers arrived at Mother's home after a suspected drug overdose by Father. Father was later pronounced deceased at the scene. Mother and Nathan Carr, an individual known to police as a drug user, were also at the scene, though Carr left shortly after first responders arrived. At that time, Crawley took S.L.S. and S.E.S. into police protective custody based on Crawley's knowledge of Mother's fentanyl use and Father's suspected fentanyl-related death. A court report prepared by a child placement agency, TFI Family Services, Inc. (TFI), indicated S.L.S. and S.E.S. were left unsupervised at the time.

The next day, Mother was riding in a car involved in a hit and run. While investigating the hit and run, Crawley believed Mother dropped a bag of white powder, which tested positive for cocaine. During an interview that same day about Father's drug overdose death, Mother told police she drove Carr to Wichita to get fentanyl. Thereafter, they returned to Mother's home, where Carr sold the fentanyl to Father. Mother also admitted the bag she dropped contained cocaine but said it belonged to Father. Mother "indicated she had thought about using it." She further "admitted to recent drug use." Police later received a statement from Father's sister (the Aunt) that, on the night of Father's death, Mother called the Aunt admitting that she had given fentanyl to Father.

On August 29, 2022, the State filed petitions to adjudicate S.L.S. and S.E.S. as children in need of care (CINC). At the August 31, 2022 temporary custody hearing, the district court placed S.L.S. and S.E.S. in Department for Children and Families (DCF) custody, finding: "Due to the admission of use of fentanyl by the mother, the mother's

2

possession of cocaine, and the drug overdose of the father, the [children's] health, welfare and safety are at risk."

In October 2022, the children were adjudicated as children in need of care at an adjudication and disposition hearing. The district court ordered that the children remain in DCF custody with out-of-home placement and approved placement with the Aunt and her husband. The court ordered the following tasks for Mother:

- Supervised visitation allowed after two consecutive negative urinalysis tests;
- obtain a drug and alcohol evaluation and follow any recommendations;
- attend narcotics anonymous (NA meetings) and obtain a sponsor;
- complete an approved parenting class;
- refrain from drugs and alcohol;
- obtain appropriate housing and employment; and
- maintain contact with the case team and actively work the case plan.

After a review hearing in February 2023, the district court found Mother was "not currently participating in [the] case plan and has had a recent positive drug test for fentanyl." Therefore, the court found reintegration was no longer viable. At a permanency hearing in April 2023, the district court found agencies made reasonable efforts to complete reintegration goals and adoption or permanent custodianship were in the children's best interests. In its ruling, the court made the following findings:

> "The mother has not been engaging with her case team in a consistent manner nor has she been working on her case plan tasks. She has called her case team to speak with the child[ren] but has not completed her drug screen requirements for any contact/visitation. The mother also has an open criminal case in Buter County District Court 23 CR 025. Due to the mother failing to complete drug screens as ordered by the court, maintaining

contact with her case team, or complete case plan tasks as directed, reintegration is no longer a viable option."

In July 2023, the State filed motions for finding of unfitness and termination of parental rights as to both S.L.S. and S.E.S., alleging the following statutory bases:

- K.S.A. 38-2269(b)(2)—conduct of a physically, emotionally, or sexually cruel or abusive nature toward the children.
- K.S.A. 38-2269(b)(3)—use of intoxicating liquors or narcotic or dangerous drugs as to render Mother unable to care for the children's physical, mental, or emotional needs.
- K.S.A. 38-2269(b)(4)—Mother's physical, mental, or emotional abuse or neglect or sexual abuse of the children.
- K.S.A. 38-2269(b)(7)—failure of reasonable efforts by the appropriate public or private agencies to rehabilitate the family.
- K.S.A. 38-2269(b)(8)—lack of effort by Mother to adjust her circumstances, conduct, or conditions to meet the children's needs.
- K.S.A. 38-2269(c)(2)—Mother's failure to maintain regular visitation, contact, or communication with the children or the children's custodian.
- K.S.A. 38-2269(c)(3)—Mother's failure to carry out a reasonable plan approved by the court directed toward reintegration.
- K.S.A. 38-2269(c)(4)—Mother's failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay.

At the September 2023 termination hearing, four witnesses testified for the State: Melody Hogoboom, an employee at Assured Occupational Solutions, which conducted Mother's drug tests; Kristi Ashenfelter, Mother's probation officer in her criminal case; Mandi Sherman, permanency case manager for TFI; and Ashlee Conner, parent partner for TFI. Mother testified on her own behalf.

After taking the case under advisement, the district court announced its ruling terminating Mother's parental rights. The district court stated: "I think there's evidence to support each of the . . . areas that the State has cited as—as grounds for termination. But I will—I didn't use all of those in regards to—to making my ultimate finding." In its oral ruling, the court explicitly cited four statutory factors, namely, K.S.A. 38-2269(b)(3), (b)(4), (b)(7), and (b)(8). The court found Mother's conduct was not likely to change in the foreseeable future. The court also found by clear and convincing evidence that termination was in the children's best interests. In its journal entry, the district court cited eight statutory bases for termination alleged by the State in finding Mother unfit: K.S.A. 38-2269(b)(2), (b)(3), (b)(4), (b)(7), (b)(8), (c)(2), (c)(3), and (c)(4). Mother now appeals.

ANALYSIS

*The District Court's Finding that Mother Was Unfit Was Supported by Clear and Convincing Evidence*

*Standard of Review*

When a child has been adjudicated as a child in need of care under K.S.A. 38-2202(d), the district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). Accordingly, "[t]ermination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). In making this determination, the appellate court does "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

5

*Discussion*

Our Supreme Court recently explained the required findings for unfitness after applying the statutory factors:

> "After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. 'The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them.' [Citation omitted.]" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024).

### A.    *Four Statutory Factors Cited in the District Court's Ruling*

The district court's written journal entry ruled that eight statutory factors of unfitness applied in this case. Although the district court's earlier oral ruling only listed four statutory factors, we will review several statutory factors from the written journal entry. See *Valadez v. Emmis Communications*, 290 Kan. 472, 482, 229 P.3d 389 (2010) (holding that in civil case, a written journal entry controls). We will address four of the statutory factors:  K.S.A. 38-2269(b)(3), (b)(7), (b)(8), and (c)(4). Any one of those factors, standing alone, may establish grounds for termination. K.S.A. 38-2269(f).

#### 1.    *K.S.A. 38-2269(b)(3)—Use of intoxicating liquors or narcotic or dangerous drugs*

Mother contends generally that the evidence was insufficient to show that she was an unfit parent. She does not appear to contest her positive drug tests and failures to show up for other tests. The State responds that Mother's admissions to using fentanyl, her positive and missed drug tests, and her cocaine possession conviction and subsequent

6

probation violations supported a finding of unfitness for abuse of narcotic or dangerous drugs.

At the termination hearing, Hogoboom testified about Mother's drug testing history. On September 1, 2022, Assured conducted both a hair follicle test and urinalysis test. The hair follicle test was positive for byproducts of cocaine. The urinalysis test was positive for cocaine, benzodiazepines, barbiturates, amphetamine, and methamphetamine. Mother then completed six consecutive negative urinalysis tests between October and December 2022, though Assured was not testing for fentanyl at these times as case workers did not specifically request fentanyl tests. On December 29, 2022, Mother's urinalysis test was positive for fentanyl. On April 6, 2023, Mother's hair follicle test was positive for cocaine and fentanyl, and her urinalysis test was positive for methadone, fentanyl, and marijuana. Over the next month, Mother twice tested positive for both fentanyl and THC. During that period, Assured confirmed that Mother had a prescription for methadone. On May 24, 2023, Mother again tested positive for fentanyl. Mother also failed to show up for 31 drug tests between January 2023 and August 2023.

Ashenfelter had been Mother's probation officer since shortly after Mother's sentencing in July 2023 for a conviction for cocaine possession, related to the August 2022 hit and run investigation when Mother dropped a bag of cocaine. Ashenfelter testified that Mother tested positive at Ashenfelter's office for fentanyl and methadone in July 2023 and positive for fentanyl, methamphetamine, and cocaine in August 2023. Mother then entered inpatient drug treatment, where she remained at the time of the termination hearing. While in inpatient treatment, Mother relapsed after receiving methamphetamine from another patient. Ashenfelter filed a warrant for probation violations after Mother, on four occasions, left the county without permission and visited a hotel in a known drug area; failed to go to detox; took unprescribed suboxone, an opioid medication; and failed to obtain employment. At the time of the termination

7

hearing, Mother had another pending criminal case for distribution of a controlled substance causing death, related to Father's fentanyl overdose.

When asked about her positive drug tests, Mother specifically disputed her drug tests containing methadone and fentanyl, stating she was not using fentanyl while on methadone. She stated she was clean "between four and six months" after her first positive test in September 2022 but then "slipped up." Mother, however, was unaware that her negative tests in the fall of 2022 were not testing for fentanyl. She also explained that her positive fentanyl test in December 2022 stemmed from depression for not having her kids for the holidays. She admitted to failing to show up for several tests after January 2023 and relapsing while in inpatient treatment.

The district court found "by clear and convincing evidence that the use of intoxicating liquors, or narcotics, or dangerous drugs of such duration or nature, . . . render[ed] the parent unable to care for the ongoing physical, mental and emotional needs of the children." Because Mother had not yet had a preliminary hearing in her pending criminal case for distribution of a controlled substance causing death, the court did not consider that case in its findings. But the court noted Mother's pending probation violation hearing in her cocaine possession case, her multiple positive drug tests and no-shows for drug tests, and her continued drug use in inpatient treatment. The court stated it "did not believe [Mother's] grounds in regards to her continued use [of drugs]."

To show a parent's unfitness due to use of intoxicating liquors or narcotics, "[t]he State is not required to provide direct evidence that a parent's conduct is due to drug use if sufficient evidence shows that drug use impeded reintegration." *In re M.S.*, 56 Kan. App. 2d 1247, 1258, 447 P.3d 994 (2019). Likewise, the State does not need to provide "direct evidence that a parent's drug use is in and of itself harmful to a child where clear and convincing evidence shows that the parent's failure to acknowledge his [or her] drug

8

issues creates a significant impediment towards reintegration." 56 Kan. App. 2d at 1258-59.

The *In re M.S.* panel found there was sufficient evidence to find the mother unfit for use of intoxicating liquors or narcotics, highlighting the mother's failure "to meaningfully participate in drug abuse therapy," her multiple missed drug tests, and one drug test showing trace amounts of methamphetamine. 56 Kan. App. 2d at 1259. The panel concluded: "The district court could reasonably infer from the evidence that Mother's drug use impeded her reintegration with the children." 56 Kan. App. 2d at 1259.

Here, Mother continued testing positive for fentanyl and other illegal drugs throughout this case. In addition to missing several drug tests, Mother's drug use continued after being convicted of cocaine possession and with a pending probation violation hearing due to alleged drug-related activity. Furthermore, Mother admitted to using methamphetamine during inpatient treatment, two weeks before the termination hearing. Mother submitted negative drug tests in the fall of 2022, but, thereafter, she consistently missed or had positive drug tests, thereby hindering reintegration efforts. Therefore, viewing the evidence in a light most favorable to the State, there was clear and convincing evidence that Mother was unfit based on use of narcotic or dangerous drugs. See *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

> 2. *K.S.A. 38-2269(b)(7)—Failure of reasonable agency efforts to rehabilitate the family*

Mother argues that TFI failed to make reasonable efforts toward reintegration. She references the DCF Policy and Procedures Manual. But her argument appears to be based on her own testimony that she complied with case plan tasks, TFI did not maintain adequate communication with her, and TFI did not perform a home visit.

The State responds that because any one factor can be sufficient to terminate parental rights, "termination may occur without *any* efforts being provided by the agency." See K.S.A. 38-2269(f). The State argues that, regardless, the district court found that TFI made reasonable efforts in its ruling terminating Mother's parental rights. The State believes TFI made reasonable efforts, but Mother failed to take advantage of them, as shown by her lack of consistent contact with TFI; her failure to complete a second drug and alcohol evaluation after testing positive for fentanyl; and her failure to provide proof of employment, suitable housing, or completion of a parenting class.

Sherman had been Mother's case manager since March 2023. At the termination hearing, she testified that, in total, Mother had two visits with S.L.S. and S.E.S., both in December 2022. Mother had no further visits because "she has not had two clean [urinalyses]; because she has not followed case plan tasks; because she's not been in communication with TFI on a regular basis." Sherman told Mother "numerous times" that failing to show up for a drug test would be considered a positive test result. Sherman also had trouble contacting Mother and knew prior case managers experienced similar struggles. Sherman "would text [Mother], and sometimes she would answer back, sometimes she would not."

In May 2023, Sherman informed Mother that "she really needed to step up if she was wanting to go into reintegration. And, otherwise, the case was going to termination [at] the end of June, and she would need to be in constant contact with us." However, "most of the time," Mother still did not respond to Sherman's calls or texts. TFI attempted to contact Mother "at least, once a month" and even more frequently before the case went to termination. They had to "message [Mother] numerous times to try to get a reply, usually by text or call." Sherman was unable to do a walk-through of Mother's home after Mother claimed "it was run down" and "needed work done to it." Sherman was also unable to verify where Mother's income came from.

10

Conner was assigned as Mother's parent partner at the beginning of the case, but she closed out her file a month later due to Mother's lack of contact. Conner reentered the case around March 2023 after Mother indicated "she was ready to work the case." Conner stated she "did have sporadic conversations with [M]other, but I would have to text her multiple times to get a response. She never really engaged with me." Mother would not respond when asked if she would attend her drug tests. To Conner's knowledge, Mother did not work the case plan. Mother never returned Conner's phone calls and responded to texts "[m]aybe once every two weeks." TFI never sent Conner to Mother's home, as the case team "could not guarantee that there was not fentanyl present."

Conner also testified that she discussed with Mother "how important sobriety was in order to bring [S.L.S. and S.E.S.] home." Conner recalled that Mother told her she was "trying to get sober," which was why she was on methadone. When Conner suggested inpatient treatment, "the conversation would just stop."

Mother disagreed with Sherman and Conner's testimony that she had not worked the case plan. When asked what case plan tasks she had completed, Mother pointed to her initial drug and alcohol evaluation in the fall of 2022 and a mental health evaluation she completed at that same time. Mother testified that she disclosed her fentanyl use at the time of this first evaluation. She also claimed she had seen a mental health counselor for four months, completed a parenting class shortly before entering inpatient treatment, and obtained another drug and alcohol evaluation in August 2023. Mother did not provide TFI with a certificate of completion for the parenting class. Mother further testified that she had a full-time job at AutoZone, "suitable housing," "brand new clothes" for S.L.S. and S.E.S., a vehicle, and health insurance. She was set to begin her job at AutoZone after finishing inpatient treatment. Her present income was derived from "savings accounts," "doing nails," an "herbal side job," and her father. She claimed TFI never requested a budget from her, but she could provide one. Mother acknowledged that she had never attended a case plan meeting, contending that she was never told about them.

Mother conceded that she did not participate in the case plan early on, causing Conner to drop her for lack of contact. However, Mother claimed she later attempted to contact her case workers "every two weeks. Some times every week. And sometimes it was a couple of days in a row." She claimed the case workers contacted her "[m]aybe once a month," later recalling that TFI contacted her "twice, maybe three times" from August 2022 to June 2023. She started "constantly messaging" Conner in June 2023 after deciding to seek treatment at a methadone clinic. Mother recalled that she messaged Conner "several, several, several times. And then, two months later, I would get a message: 'Oh. I didn't see these. Sorry.'"

The court made the following findings on TFI's efforts: "There have been numerous opportunities. The agency did make efforts, and you [Mother] have consistently avoided those. You did it with TFI; you—with the social worker; you did it with the parent partner; you did it even in regards to counsel, not—not being at hearings."

The State compares this issue to *In re T.M.*, No. 122,488, 2020 WL 5080058 (Kan. App. 2020) (unpublished opinion). There, CINC proceedings began shortly after T.M.'s birth in August 2018. After a paternity test confirmed T.M.'s father, the father became involved in the case in February 2019. The district court terminated the father's parental rights in July 2019. On appeal, the father argued that the agencies failed to provide reasonable efforts to rehabilitate the family, arguing that "the agencies did not expend reasonable efforts and the length of time he was given to comply with the court orders was too short." 2020 WL 5080058, at *3.

The *In re T.M.* panel disagreed, noting that the agencies did a home walk-through, provided the father with supplies and resources, and spoke with the father multiple times about his case plan tasks. The record showed the father was not receptive to the agencies' assistance and was frequently untruthful about completing his case plan tasks. Therefore, the panel concluded there was clear and convincing evidence that the father was unfit for

12

failure of reasonable efforts by the agencies to rehabilitate the family. 2020 WL 5080058, at *6; see *In re M.S.*, 56 Kan. App. 2d at 1257 ("'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.'").

Similarly, here, Sherman and Conner testified to their consistent efforts to communicate with Mother, many of which were unsuccessful. After Mother provided multiple negative drug tests in the fall of 2022, TFI facilitated visits for Mother with S.L.S. and S.E.S. Those visits stopped when Mother tested positive again in December 2022. Mother then failed to show up for 31 drug tests despite Sherman's warnings that failure to show up would result in a positive test. Mother also prevented TFI's attempt to conduct a home visit, claiming her home needed work done. Additionally, Conner dropped Mother from parent partner services early in the case for failure to contact and did not reenter the case until Mother stated she was ready to work the case plan in March 2023. After Mother failed to show up for drug tests and tested positive multiple times, Sherman and Conner both discussed with Mother the importance of becoming sober and exerting more effort toward reintegration. Still, Mother failed to maintain consistent contact with TFI and was not receptive to Conner's suggestions for treatment. Although Mother testified that she completed some case plan tasks shortly before the termination hearing, she did not provide proof to TFI. The record here shows by clear and convincing evidence that TFI made reasonable efforts to rehabilitate the family, but Mother failed to adequately make use of those efforts.

> 3.    *K.S.A. 38-2269(b)(8)—Lack of effort to adjust the parent's circumstances, conduct, or conditions*

Mother does not explicitly address this factor in her brief. She generally argues that the evidence did not show she was unfit. She also argues that she made efforts to

13

comply with her case plan tasks. The State argues that Mother's continued drug use and failure to utilize services provided by TFI showed she failed to adjust her conduct.

In its finding on Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the children's needs, the district court pointed to Mother's continued use of drugs after Father's overdose death. The court stated Mother "always had excuses" to not follow case plan tasks or stop using drugs.

Another panel of this court examined this factor in *In re R.S.*, 50 Kan. App. 2d 1105, 336 P.3d 903 (2014). There, over the course of 10 months, the mother completed some of her case plan tasks but did not complete many others. The mother attended some visits and completed parenting classes but failed to maintain regular contact with her court services officer, failed to obtain mental health and substance abuse assessments, missed drug tests, and was not financially independent. The *In re R.S.* panel found the mother "made only minimal efforts" to complete her case plan tasks and concluded there was clear and convincing evidence that she failed to adjust her circumstances to her children's needs. 50 Kan. App. 2d at 1117.

On appeal, Mother asserts that she had taken some steps toward adjusting her circumstances. She points to her attempt to complete inpatient addiction treatment and testified that she completed a parenting class, secured employment, and had suitable housing. However, none of these case plan tasks have been verified; she never sent proof to TFI that these tasks were completed.

Mother fell short of completing her case plan tasks and taking meaningful steps toward reintegration in other ways. She consistently failed to maintain contact with TFI, missed drug tests, and repeatedly submitted positive drug tests, thus stunting attempts to reinitiate visits with the children and move toward reintegration. Additionally, Mother admitted to relapsing on methamphetamine while in inpatient treatment and had a

14

pending probation violation hearing for alleged drug-related activity. As the district court indicated, Mother's continued drug activity was particularly concerning given the origin of this case with Father's overdose death. Accordingly, there was clear and convincing evidence that Mother failed to adjust her circumstances, conduct, or conditions to meet her children's needs.

4. *K.S.A. 38-2269(c)(4)—Failure to pay a reasonable portion of the cost of substitute physical care based on ability to pay*

For this factor, Mother does not explicitly challenge the court's ruling in her brief. She generally attacks the district court's findings that her conduct showed she was unfit. The State does not address this factor in its brief. "Issues not adequately briefed are deemed waived or abandoned." *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

Even considering this issue, the record does not support this factor as the district court is required to consider a parent's payment of costs "based on ability to pay." K.S.A. 38-2269(c)(4). In its oral ruling, the district court here made no explicit findings on Mother's unfitness under this factor. There is no indication that the court considered Mother's ability to pay child support, as K.S.A. 38-2269(c)(4) mandates.

Mother testified that, at the time of the termination hearing, her income was derived from "savings accounts," "doing nails," an "herbal side job," and her father. There was no evidence of the amount or sustainability of these sources of income. While Mother testified that she would have paid child support if she had received a bill, Sherman testified that Mother could "never verify where her money came from and how she lived." Thus, the record here contains little to no evidence suggesting Mother had a sustainable income enabling her to pay child support during the CINC proceedings.

Therefore, we find that there was not clear and convincing evidence that Mother was unfit under K.S.A. 38-2269(c)(4).

### B. *Mother's Conduct Was Unlikely to Change in the Foreseeable Future*

In a parental termination hearing, once the district court finds a parent unfit, it must determine whether the parent's conduct or condition is unlikely to change in the foreseeable future from the child's perspective of time. *In re D.G.*, 319 Kan. at 459.

Here, Mother submits that even if there was evidence that she was unfit, the evidence did not show she would be unfit for the foreseeable future. The State responds that Mother's failed drug tests, probation violations, and lack of proof for any completed case plan tasks established that her conduct was unlikely to change in the foreseeable future.

On appeal, the State analogizes this case to *In re R.S.* The *In re R.S.* panel found that, while the mother attended some parenting classes and visitations, she demonstrated "minimal efforts" toward reintegration in 10 months, leading the panel to conclude the mother's conduct was unlikely to change in the foreseeable future. 50 Kan. App. 2d at 1117; see *In re M.S.*, 56 Kan. App. 2d at 1264.

Similarly, here, Mother had ongoing relapses with her addiction even after entering inpatient treatment shortly before the termination hearing. The record reflects Mother's consistent shortcomings in maintaining communication with the case team and refraining from illegal drugs, which has been the paramount concern throughout this case. Mother was given a year to adjust her conduct but largely failed to do so. Therefore, there was clear and convincing evidence that Mother's conduct was unlikely to change in the foreseeable future.

C. *Termination Was in the Children's Best Interests*

*Standard of Review*

A district court's determination of the child's best interests under K.S.A. 38-2269(g)(1) should be reviewed for abuse of discretion. The district court makes the best interests determination on a preponderance of the evidence. Appellate courts determine whether the district court's factual findings are supported by substantial evidence. *In re R.S.*, 50 Kan. App. 2d at 1116. The Kansas Supreme Court has not yet weighed in on the proper standard for the best interests finding. *In re D.G.*, 319 Kan. at 463 (declining to decide whether clear and convincing standard or preponderance standard applies to best interests finding).

*Discussion*

Mother argues that, even if there was clear and convincing evidence she was unfit, "[i]t would not be in the child's best interests to have the family bond destroyed." The State does not address the best interests finding in its brief.

At the termination hearing, Sherman testified that she believed termination was in the children's best interests, claiming they were "absolutely thriving" while living with their aunt and uncle. Sherman explained that the children "do not even ask about their mother" and S.E.S. "is stressed out any time he hears anything about his mother." In Sherman's view, Mother was unable "to put [S.L.S. and S.E.S.] above herself—at all."

In *In re R.S.*, a panel of this court found no abuse of discretion in the district court's finding that termination was in the children's best interests. The panel highlighted the children's prior behavior problems, the mother's failure to complete case plan tasks, the mother's positive and missed drug tests, and her missed visitations. 50 Kan. App. 2d

at 1118. Additionally, other panels of this court have found that termination was in the child's best interests where the child had a limited relationship with the parent or favored other out-of-home placement. See *In re J.L.*, No. 116,293, 2017 WL 1832348, at *6 (Kan. App. 2017) (unpublished opinion); *In re J.A.F.*, No. 113,813, 2015 WL 7192418, at *5 (Kan. App. 2015) (unpublished opinion).

In this case, there was testimony that S.L.S. and S.E.S. did not maintain a close relationship with Mother and the children were "thriving" in their out-of-home placement. Furthermore, the record shows Mother failed to complete case plan tasks or to prioritize and overcome her drug addiction. From the time this case began with Father's death due to a fentanyl overdose in the home, Mother's drug addiction was the primary concern. Therefore, the district court did not abuse its discretion in finding that termination of Mother's parental rights was in the children's best interests.

Affirmed.